

**U.S. Department of Justice**
*United States Attorney's Office*
*District of New Jersey*

| | | |
|---|---|---|
| R. DAVID WALK, JR.<br>*Assistant United States Attorney* | *401 Market Street, 4th Floor*<br>*Camden, NJ  08101-2098* | *(973) 986-7101* |

December 15, 2025

**VIA ECF**

Honorable Edward S. Kiel
United States District Judge
Mitchell H. Cohen United States Courthouse
Fourth and Cooper Streets
Camden, New Jersey 08102

    Re:   <u>United States v. Christopher Kyle Johnston, et al., No. 20-cr-800</u>

Dear Judge Kiel:

    I write in response to defendant Christopher Kyle Johnston's letter advising the Court of two civil decisions from other circuits: *United States ex rel. Omni Healthcare Inc. v. Md. Spine Sols. LLC*, 2025 U.S. App. LEXIS 31085 (1st Cir. Dec. 1, 2025), and *Al-Sabah v. World Business Lenders, LLC*, 2025 U.S. App. LEXIS 30939 (4th Cir. Nov. 26, 2025).  *Omni Healthcare* concerned a clinical laboratory—an entity very different from Central Rexall, which, among other things, directed sales representatives, designed formulas, and interacted with patients, doctors, and pharmacy benefits managers (PBMs).  *Al-Sabah* is even less relevant, as it concerned whether a lender was willfully blind in approving real estate loan applications.  The fact-specific holdings of these two civil cases have no bearing on the questions before this Court:  whether, viewing the extensive trial evidence about defendants' conduct in the light most favorable to the Government, any rational jury could have found the defendants guilty; and whether the evidence weighs so heavily against the jury's verdict that a new trial should be granted.  Neither of these decisions ruled on a motion for a judgment of acquittal or a motion for a new trial in a criminal case, and neither supports Johnston's post-trial motions.

    *Omni Healthcare* considered whether the plaintiff relator had submitted enough evidence to show that the defendant clinical laboratory, which received doctors' orders to test urine samples, knew that the tests were medically unnecessary.  2025 U.S. App. LEXIS 31085 at *15.  Unlike Central Rexall—which had extensive contact with patients and doctors—all that the laboratory in *Omni* had "in-hand" was "a requisition form" from a doctor's office.  *Id.* at *20.  Without more, the court concluded that there was nothing in the evidence to show that the laboratory had any reason to second-guess the ordering doctor's determination of medical need and affirmed the grant of summary

1

judgment. *Id.* at *25. The *Omni* court largely based its conclusion about the laboratory's duties on the "Guidance for Clinical Laboratories" from the Office of the Inspector General for the Department of Health and Human Services, *id.* at *18—a document that does not apply to Johnston or Central Rexall.

Johnston claims on page 1 of his letter that the First Circuit in *Omni* "concluded that there is no requirement 'to independently determine the medical necessity of the tests billed.' *Omni Healthcare*, 2025 U.S. App. LEXIS 31085 at *18-19." But Johnston omits the beginning of that quoted phrase: "*neither 'the Medicare statute nor [current regulations] regarding laboratories require laboratories* to independently determine the medical necessity of the tests billed.'" 2025 U.S. App. LEXIS 31085, at *19 (quoting *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 162 (D.D.C. 2017)) (emphasis added). *Omni's* quoted conclusion is based on Medicare guidance for clinical laboratories and has no bearing on this case.

Although *Omni*'s holding is not relevant to this case, its reasoning about the scope of duty is quite damaging to Johnston's position. The court stressed repeatedly that even clinical laboratories have "'a legal duty to ensure that they do not submit claims for medically unnecessary tests.'" *Id.* at *22 (quoting *Boston Heart*, 296 F. Supp. 3d at 166); *see also* 2025 U.S. App. LEXIS 31085 at *19. That contradicts Johnston's claim that he had no duty to ensure that Central Rexall was submitting medically necessary claims if Central Rexall received a prescription signed by a doctor.

The court also qualified its statement that clinical laboratories "generally" can rely on a doctor's determination of medical necessity, *id.* at *22, by citing several situations in which reliance was unwarranted, situations that echo the evidence against Johnston and Brockmeier.

- "'When laboratories know that their own actions have made a medical service unnecessary, they should not be shielded by the independent determination of a physician . . . .'" *Id.* at *24 (quoting *United States v. Bertram*, 900 F.3d 743, 750 (6th Cir. 2018)). Defendants here knew that Central Rexall's "own actions" made its medications medically unnecessary, such as defendants' increase of the amount of resveratrol beyond what was medically necessary and approving sales representatives receiving commissions on their own prescriptions.

- "[W]hen the lab allegedly 'engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms.'" 2025 U.S. App. LEXIS 31085 at *23 n.15 (quoting *Boston Heart*, 296 F. Supp. 3d at 165). Defendants here used pre-printed forms, falsely marketed the resveratrol formulation as a weight loss medication, and encouraged physicians to order medically unnecessary medications.

2

- "[W]hen the lab allegedly 'engaged in a scheme to conduct duplicative presumptive testing without regard to medical necessity and to encourage physicians to order additional screening tests as a matter of course.'" 2025 U.S. App. LEXIS 31085 at *23 n.15 (quoting *United States ex rel. Allstate Ins. v. Phx. Toxicology & Lab Servs., LLC*, 2024 WL 2785396, at *9 (D.N.J. May 30, 2024)). Defendants here, through their sales representatives, encouraged doctors and patients to order medically unnecessary refills by pushing the maximum number of refills and shipping medicines even when patients failed to pay required copays.

In addition to these examples, the First Circuit in *Omni* reasoned that laboratories could not treat a doctor's prescription as conclusive and could be responsible for medically unnecessary claims if there was evidence of "some other chicanery at play." 2025 U.S. App. LEXIS 31085 at *21. Such "chicanery" was rampant at Central Rexall.

The Government presented seven weeks of evidence of the "chicanery at play" at Central Rexall, which is summarized at great length in the Government's post-trial brief, ECF 342 at 6-57, 64-80, and post-hearing brief, ECF 369 at 1-5. The chicanery included, but was not limited to: (a) continuing to fill Top Tier prescriptions even after learning that some of Candace Craven's patients did not know her and that Top Tier was under federal criminal investigation for fraud; (b) billing for Supreme Medical prescriptions despite countless red flags showing a lack of doctor-patient relationships; (c) billing for Military Medical Relief 21 prescriptions even after knowing its patients were paid and its doctors lacked a proper doctor-patient relationship and were prescribing extreme numbers of these specialty medications[1]; (d) billing for Boardwalk Medical prescriptions despite all the evidence that they were medically unnecessary, which was apparent from the information available to Johnston and Brockmeier and which Hailey Taff and Ryan Boyle specifically raised with them; (e) manipulating the ingredients to create formulas that were profitable but not medically necessary; (f) ignoring countless red flags that the prescriptions were in fact medically unnecessary; and (g) Johnston and Brockmeier's repeatedly making and approving false statements to keep their fraudulent scheme from being detected.

In sum, Johnston and Brockmeier's knowledge that Central Rexall was submitting medically unnecessary claims—which included, but was not limited to, their willful blindness of same—was established by the evidence presented during trial about their active role in managing Central Rexall, false

---

[1] As the Government demonstrated in its post-hearing brief, the Court's instructions permitted the jury to credit Serna's testimony about his interactions with Johnston and Brockmeier even though Serna testified falsely about other matters. ECF 369 at 7. But the jury also had ample evidence to convict defendants even if the jury decided to disregard Serna's testimony, because Serna's testimony was in no way essential to the verdict. Indeed, the Government did not even rely on the credibility of Serna's testimony during its closing. Trial Tr. at 3846-49. The overwhelming majority of the Government's evidence had nothing to do with Serna, as the summary of Serna's testimony occupies only three pages of the Government's 103-page post-trial brief.

statements, the duties of pharmacies, Central Rexall's contractual obligations to PBMs, and Central Rexall's close relationships with sales representatives, doctors, and patients. The jury recognized this and convicted Johnson and Brockmeier of the crimes charged. By contrast, *Omni Healthcare* was a civil decision, made in the very different context of clinical laboratories governed by Medicare regulations and guidance documents, and it has no application here. And even the general legal principles discussed in *Omni Healthcare* reinforce the Government's position and do not help Johnston and Brockmeier. *Omni Healthcare* provides no basis for overturing the jury's verdict or granting a new trial.

*Al-Sabah* is even less on point, as it discussed whether a lender that underwrote real estate loans was civilly liable for the tort of aiding and abetting a fraudulent scheme. 2025 U.S. App. LEXIS 30939 at *1-3. The Fourth Circuit based its conclusion that the lender was not willfully blind on a detailed analysis of the facts, *id.* at *19-33, including the lender's "reliance on multiple professional opinions – a gold standard in lending practice," *id.* at *33.[2] The court's fact-bound decision established no new principle of law that would help Johnston and Brockmeier; the Fourth Circuit simply concluded that the particular facts in *Al-Sabah* did not rise to the level of willful blindness. *Al-Sabah* does not contradict the numerous Third Circuit decisions cited in the Government's briefs showing that the evidence in this case supported a willful blindness instruction and the jury's verdict.

Johnston closes his letter by rearguing the facts of willful blindness as if he were arguing the question anew before the jury. Again, he misapprehends the issues before the Court and the governing legal standard at this stage of the proceedings. The only questions now before the Court are whether the evidence, taken in the light most favorable to the Government, provided a basis for the Court to give the willful blindness instruction and a basis for the jury to find guilt. As the Government has demonstrated at length in its post-trial and post-hearing briefs, the evidence was more than sufficient.

---

[2] Defendants repeatedly rely on the involvement of Ryan Boyle, but he was far from the "gold standard": he had no experience when he was hired; Johnston trained and dominated him; defendants ignored concerns that he raised; Johnston repeatedly told him to make false statements in response to inquiries; and, by Boyle's own admission, he was not a very good chief compliance officer, Trial Tr. 2563. The jury had ample basis to conclude, as the Government argued in its closing, that Central Rexall's compliance program was "bogus" and that defendants used Boyle only to "give the superficial impression of compliance without letting it impede their fraudulent scheme." Trial Tr. 3870.

Defendants' post-trial motions should be denied.

                                                Respectfully submitted,

                                                TODD BLANCHE
                                                U.S. Deputy Attorney General

                                                PHILIP LAMPARELLO
                                                Senior Counsel

                                                */s/ R. David Walk, Jr.*

                                                R. DAVID WALK, JR.
                                                Assistant United States Attorney

cc: All counsel (via ECF)